JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
ELI A. ALCARAZ (Cal. Bar No. 288594)
MICHAEL J. MORSE (Cal. Bar No. 291763)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    312 North Spring Street, Floor 15
    Los Angeles, California 90012
    Telephone: (213) 894-3424/7367/3819
    Facsimile: (213) 894-6269
    Email:    Eli.Alcaraz@usdoj.gov
            Michael.Morse@usdoj.gov
            Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 24-527-SVW |
|---|---|
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL (DKT. NO. 63) |
| v. | |
| TREVOR JAMES KIRK, | Hearing Date: April 21, 2025 |
| Defendant. | Hearing Time: 11:00 a.m. |
| | Location:    Ctrm. of the Hon. Stephen V. Wilson |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Eli A. Alcaraz, Michael J. Morse, and Brian R. Faerstein, hereby files its Opposition to Defendant Trevor Kirk's Motion for Judgment of Acquittal Per Federal Rule of Criminal Procedure 29(c) (Dkt. No. 63).

///

///

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 17, 2025                    Respectfully submitted,

                                         JOSEPH T. MCNALLY
                                         Acting United States Attorney

                                         LINDSEY GREER DOTSON
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                              /s/
                                         _____
                                         ELI A. ALCARAZ
                                         MICHAEL J. MORSE
                                         BRIAN R. FAERSTEIN
                                         Assistant United States Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................i

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

      A.   Defendant and His Partner De-Escalated and Obtained
           Voluntary Compliance From D.B............................2

      B.   Defendant Willfully Used Unreasonable and Excessive
           Force Against J.H.......................................4

      C.   J.H.'s Bodily Injury and Extreme Physical Pain..........6

      D.   Defendant's Training Regarding Use of Force, De-
           Escalation, and LASD Force Policies.....................7

      E.   Expert Testimony Regarding Defendant's Conduct
           Conflicting with LASD Policy and Training...............9

III.  RULE 29 STANDARD.............................................9

IV.   ARGUMENT....................................................11

      A.   The Evidence Was Sufficient for Any Rational Trier of
           Fact to Find That Defendant Used Unreasonable or
           Excessive Force........................................11

           1.   The Government's Evidence Was More Than
                Sufficient........................................11

           2.   Defendant's Arguments Fail........................13

      B.   The Evidence Was Sufficient for Any Rational Trier of
           Fact to Find That Defendant Acted Willfully............19

           1.   The Government's Evidence Was More Than
                Sufficient........................................19

           2.   Defendant's Arguments Fail........................23

V.    CONCLUSION..................................................25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

Graham v. Connor,
    490 U.S. 386 (1989) ......................................... 12, 18

Hyde v. Cty. of Willcox,
    23 F.4th 863 (9th Cir. 2022) ................................... 13

Jackson v. Virginia,
    443 U.S. 307 (1979) ............................................ 10

McDaniel v. Brown,
    130 S. Ct. 665 (2010) ......................................... 10

United States v. Begay,
    673 F.3d 1038 (9th Cir. 2011) .................................. 9

United States v. Del Toro-Barboza,
    673 F.3d 1136 (9th Cir. 2012) ................................. 14

United States v. Goldtooth,
    754 F.3d 763 (9th Cir. 2014) ................................... 1

United States v. Nevils,
    598 F.3d 1158 (9th Cir. 2010) ............................. passim

United States v. Pelisamen,
    641 F.3d 399 (9th Cir. 2011) ................................... 1

United States v. Rojas,
    554 F.2d 938 (9th Cir. 1977) .............................. 15, 16

United States v. Rubio-Villareal,
    967 F.2d 294 (9th Cir. 1992) ............................... 9, 19

**Statutes**

18 U.S.C. § 242................................................ 2, 11

**Rules**

Federal Rule of Criminal Procedure 29.......................... passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant Trevor James Kirk's ("defendant") Motion for Judgment of Acquittal reads like a second bid at closing argument.  He ignores the vast weight of evidence against him, misstates facts, and distorts testimony, all in asking this Court to substitute its judgment for that of the jury's verdict.  In short, defendant turns the sufficiency review standard on its head.  But when the Court considers the evidence in the light most favorable to the government -- as it must -- there was more than sufficient evidence for a rational jury to find defendant guilty beyond a reasonable doubt.

The government's evidence was direct and comprehensive, providing jurors with video evidence of defendant's use of excessive force against victim J.H. from multiple views and perspectives.  The jury had a uniquely inside and unvarnished look at the central events at issue, including defendant's words and actions before, during, and after the incident, as well as his partner's contrasting words and actions.  Los Angeles County Sheriff's Department ("LASD") policies and training further established that force was supposed to be used as a "last resort," contrary to defendant's immediate resort to force after seeing J.H. filming him on her cellphone.  And an expert with nearly three decades of experience at LASD explained how defendant's conduct was contrary to LASD's force policies and training.

Given the "great deference" afforded a jury's verdict, <u>United States v. Pelisamen</u>, 641 F.3d 399, 409 n.6 (9th Cir. 2011), evidence supporting a verdict is found insufficient only on "rare occasions." <u>United States v. Goldtooth</u>, 754 F.3d 763, 768 (9th Cir. 2014).  This is not that rare case.  Defendant's Motion should be denied.

## II.   STATEMENT OF FACTS

Following a three-day trial, and after just over two hours of deliberations, the jury convicted defendant of deprivation of rights under color of law, in violation of 18 U.S.C. § 242.  (See CR 51[1] (Redacted Verdict Form), 60 (2/6/25 Trial Tr.) at 82:1.)  The jury found defendant guilty of a felony violation, determining that victim J.H. suffered bodily injury, the offense involved the use of a dangerous weapon, or both.  (See CR 51.)

In support of the jury's verdict, the government presented substantial and compelling evidence through the testimony of five witnesses; extensive recordings and photographs of the use-of-force incident and surrounding events from multiple vantage points; numerous training records, LASD policies, and other documentary evidence; and multiple stipulations of fact.  The government's evidence established the following facts proving defendant's willful deprivation of J.H.'s rights by use of unreasonable and excessive force.

### A.   Defendant and His Partner De-Escalated and Obtained Voluntary Compliance From D.B.

On June 24, 2023, shortly after 12:00 p.m., defendant and his partner that day, LASD Deputy Felipe Alejandre, Jr. ("Alejandre"), responded to a "211 now," or robbery in progress, call for service at a WinCo Foods grocery store (the "WinCo") in Lancaster, California. (GEX 125.)  The parties stipulated that defendant and Alejandre were informed by LASD dispatch that a male and female reportedly were "fighting with loss prevention" at the WinCo; that the two suspects

---

[1] "CR" refers to ECF court docket numbers.  "GEX" refers to the government's trial exhibits that were received in evidence.  "Mot." refers to defendant's motion for judgment of acquittal (CR 63).

2

1    were outside the store in a black Toyota; and that it was unknown if

2    they had weapons.  (Id.)  The parties also stipulated that "robbery"

3    under California law included what is known as an Estes robbery,

4    where a shoplifter pushes past a retail loss prevention employee to

5    take merchandise from a store, and that LASD officers understood that

6    a "211 now" call could include an Estes robbery.  (Id.)

7         Throughout trial, the jury saw multiple audio-video recordings

8    of the ensuing events in the WinCo parking lot, including from

9    Alejandre's body worn camera (GEX 1); defendant's body worn camera

10    (GEX 5); WinCo parking lot surveillance footage (GEX 36); a cellphone

11    recording made by a bystander (GEX 52); and a cellphone recording

12    made by J.H. before defendant slammed her to the ground (GEX 55).

13    The government also showed several composite exhibits containing two

14    or three of these videos side-by-side.  (GEX 45, 46, 47.)

15         The recordings showed that when Alejandre arrived at the WinCo

16    parking lot before defendant, J.H. and D.B. -- who were 58 and 56

17    years old, respectively (GEX 125) -- were pulling out of an

18    accessible (commonly known as handicapped) parking spot in the black

19    Toyota.  But they pulled back in (and did not flee) upon Alejandre's

20    arrival.  (GEX 36.)  D.B. exited the Toyota holding only a cake,

21    while J.H. remained in the car.  (GEX 1, 36.)  Keeping his distance,

22    Alejandre issued a series of commands to D.B., who ultimately

23    complied with Alejandre's request to "just have a seat on that rock."

24    (GEX 1.)  Alejandre informed defendant over his radio that "the

25    female is gonna be in the car."  (GEX 1.)

26         Despite being told the other possible suspect was in a car less

27    than 50 feet from where D.B. was sitting (CR 58 (2/4/25 Trial Tr.) at

28    42:21-43:6), defendant paid no attention to J.H. in the car when he

3

arrived.  Instead, he and Alejandre approached D.B. together and de-
escalate the situation.  Alejandre asked D.B., "what's going on,
dude?" and told him to "just relax."  (GEX 1.)  Defendant calmly told
D.B., "we're just going to pat you down, bud, big dog," reiterated
that D.B. should "relax," and explained "you're not under arrest,
you're being detained."  (GEX 1, 5.)  Using de-escalation techniques
and communicating effectively, as they were trained to do, defendant
and Alejandre were able to detain D.B. without incident.  (Id.)

### B. Defendant Willfully Used Unreasonable and Excessive Force Against J.H.

The evidence showed, from multiple angles and perspectives, that
defendant took a starkly different -- and unjustifiably violent --
approach toward J.H.

As defendant and Alejandre were detaining D.B., J.H. walked
towards the deputies and told them, from a distance, "by law you have
to tell him the reason you [sic] detaining him."  (GEX 1, 5, 36, 55.)
As J.H. filmed the detention of D.B. on her cellphone, she told the
deputies, "it's on YouTube Live."  (Id.)  After Alejandre identified
J.H. to defendant as the "wife" for the second time, defendant turned
around, saw J.H. filming the deputies with a cellphone in one hand
and a surgical mask in the other, and aggressively approached her,
closing the distance between them in seconds.  (GEX 5, 36, 55, 69, 74.)

Unlike the deputies' encounter with D.B. moments earlier, during
defendant's initial approach of J.H., defendant did not ask any
questions or issue any commands.  (GEX 6, 52, 55.)  Nor did defendant
tell J.H. what he was doing or communicate with her in any way.
(Id.)  Instead, he immediately tried to grab J.H.'s phone with both
his hands and then grabbed her right arm, leading J.H. to twice

4

1    respond, "You can't touch me!"  (GEX 5, 36, 52, 55, 68, 69.)  With no

2    basis to understand why defendant was grabbing her, J.H. reactively

3    pulled her arm away and attempted to swipe away defendant's grasp.

4    (GEX 5, 36, 52.)  Defendant twice said, "Stop!," but provided no

5    explanation as to what he was trying to do or what J.H. was supposed

6    to stop doing.  (GEX 5, 52, 55.)

7         Within seconds of grabbing J.H. and making no attempt to issue

8    commands, warnings, or instructions, defendant violently slammed J.H.

9    to the hard concrete of the WinCo parking lot.  (GEX 36, 52; see also

10   GEX 5, 55, 75.)  J.H. screamed out as she barreled uncontrollably

11   face-first toward the ground.  (GEX 5, 52.)

12        After J.H. struck the ground, defendant put his knee on her

13   body, pushed her head to the concrete, and yelled at her to get on

14   the ground, even though she was already there.  (GEX 1, 5, 52, 76.)

15   J.H. once again said defendant's actions were "already on YouTube

16   Live;" seconds later, defendant cocked his arm back, closed his fist,

17   and threatened, "Stop or you're going to get punched in the face."

18   (GEX 1, 5, 52, 67.)  As D.B. called out in the background, "she's got

19   cancer!", defendant put his knee on J.H.'s neck.  (GEX 1, 5, 52, 77.)

20   Defendant ordered J.H. to "turn around," but she could not move with

21   defendant's knee on her neck.  (Id.)  J.H. pleaded, "Get your neck

22   off my, off my, I can't breathe!"  (GEX 5, 52.)  With J.H. on her

23   back clutching only her surgical mask in one hand and her

24   prescription sunglasses in the other, defendant radioed that he was

25   "in a fight at the WinCo."  (GEX 5, 52, 78.)  J.H. responded, "I

26   can't breathe!"; "There's no fight!"; and "You threw me down to the

27   ground!" as defendant again said only, "Stop!"  (GEX 5, 52.)

28

Seconds later, without any intervening commands and with J.H. neither resisting nor threatening defendant in any way, defendant pepper sprayed J.H. in the face twice.  (GEX 5, 52, 78.)  After these sprays and as J.H.'s body languished on the ground, for the first time, defendant ordered J.H., "put your hands behind your back!".  (Id.)  But even then, as defendant continued leaning on J.H. with one of her arms pinned beneath her, J.H. said "I can't!" in response to defendant's impossible command.  (Id.)  Defendant rotated J.H.'s body, handcuffed her, and directed J.H. to his patrol vehicle with J.H. unable to see due to the pepper spray.  (GEX 1, 5, 6, 52.)

Before being put in defendant's patrol vehicle, J.H. told defendant, "I didn't do anything!  You was [sic] mad because I videoed and put it on YouTube."  (GEX 1.)  Defendant responded, "No I'm mad because you're not listening."  (Id.)

### C.  J.H.'s Bodily Injury and Extreme Physical Pain

Medical records, photographic evidence of J.H.'s injuries, and testimony from a treating physician proved J.H.'s bodily injury.  (GEX 66, 89; CR 59 (2/5/25 Trial Tr.) at 80-96.)  J.H. was diagnosed with, among other things, blunt head injury, multiple contusions, chemical conjunctivitis, and a closed fracture of her wrist.  (GEX 89 at 9-10.)  Body worn camera footage also established J.H.'s extreme physical pain from the pepper spray, proving its use as a dangerous weapon.  Recordings at the WinCo showed J.H. with her eyes swollen shut, spitting profusely, gasping for air, and struggling to walk and breathe, as she told defendant and the deputies she had asthma.[2]  (GEX 2, 6, 7, 15, 17, 24.)  At the hospital almost an hour later

---

[2] An asthma inhaler was found in a bag identified as belonging to J.H. in the black Toyota.  (GEX 9, 70.)

6

1  (where J.H. was released from custody), J.H. complained of her eyes

2  still "burning," while another nearby patient had trouble breathing

3  due to J.H.'s pepper spray residue and a nurse treating her coughed

4  from the lingering effects of the spray.  (GEX 20, 21, 89 at 7.)

5      **D.   Defendant's Training Regarding Use of Force, De-Escalation,
          and LASD Force Policies**

6

7      Two LASD training officers testified about the training LASD

8  deputies, including defendant, received on use of force, de-

9  escalation, and force prevention, among other topics, based not only

10 on statewide "POST" (California Commission of Peace Officer Standards

11 and Training) standards, but also LASD's use-of-force policies.

12     Sergeant Ismael Opina, the sergeant in charge of the LASD's

13 Force Training Unit, testified about the POST-certified use-of-force

14 training deputies received at LASD, including as recruits at the

15 Academy, when transitioning to patrol duty, and at least every two

16 years thereafter.  (CR 58 at 145:7-146:10; CR 59 at 5:17-6:17.)  The

17 training included de-escalation, force prevention, communication, and

18 obtaining voluntary compliance from suspects.  (CR 59 at 6:24-7:6;

19 GEX 105, 107.)  Deputies also were trained on the appropriate use of

20 Oleoresin Capsicum spray (i.e., pepper spray), which "requires active

21 resistance plus a threat."  (CR 59 at 34:15-36:19; GEX 105 at 4.)

22 Defendant's training records confirmed he received these and other

23 related trainings on numerous occasions after joining the LASD in

24 2019.  (GEX 101, 102, 103, 105A, 107A.)

25     Sergeant Opina also testified at length about deputy training on

26 the LASD's Force Policy within the Manual of Policy and Procedures,

27 which deputies are required to review, understand, and follow.  (CR

28 59 at 9:17-10:5.)  Focusing on the Force Policy in effect on the date

of the WinCo incident (GEX 145), Sergeant Opina testified about deputy training on force prevention and force as a "last resort," including deputy obligations, when feasible, to use de-escalation techniques, to seek to obtain voluntary compliance, and to engage in "tactical communication," "advisements," "warnings," and "verbal persuasion" to avoid unnecessary use of force.  (CR 59 at 13:3-23, 15:3-19:10, 24:3-25, 73:25-74:22.)  Sergeant Opina also testified about the prohibition against retaliatory force based on emotion and anger.[3]  (Id. at 25:6-26:21, 77:1-15).  In April 2020, defendant signed an acknowledgement that he "read and underst[oo]d the [LASD's] Use of Force Policy" in effect at that time and that he had "a duty to comply fully with the Policy and Procedures."  (GEX 100.)

A second LASD training officer, Deputy Jose Diaz in the LASD's Tactics and Survival Unit, testified about a Strategic Communications course deputies were required to take, separate from their force training.  (CR 58 at 96:15-25.)  In sum, the training focused on de-escalation, slowing down a situation, and gaining voluntary compliance from suspects through a progression of tactical communications "to try to avoid using force whenever possible".  (Id. at 98:2-107:4, 136:17-137:23; GEX 108, 109.)  Defendant's training records confirmed he completed Strategic Communications in both March 2022 and February 2023, just a few months before his use of excessive force against J.H.  (GEX 101, 102, 108A, 109A.)

The evidence further established that on May 31, 2023, just over three weeks before the WinCo incident, LASD recommended that

---

[3] The jury also was shown an LASD policy making clear that members of the public have a First Amendment right to video-record officers and could not be retaliated against for doing so.  (GEX 150; CR 58 at 51:2-52:23.)

1   defendant's Lancaster Station receive a station-wide briefing on de-

2   escalation and staging medical resources.  (GEX 126.)  Defendant

3   understood the recommended de-escalation training was the result of

4   another incident in which he was involved in June 2022.  (Id.)

### E. Expert Testimony Regarding Defendant's Conduct Conflicting with LASD Policy and Training

7     Roger Clark, a retired LASD officer with more than 27 years of

8   experience at LASD, provided expert testimony about the many ways in

9   which defendant's actions toward and use of force against J.H. were

10   inconsistent with LASD policy and training.  This included defendant

11   putting hands on J.H. when there was "no credible threat" and "no

12   indication of interference," and "simply giv[ing] an instruction"

13   would have been appropriate, (CR 59 at 126:1-13); throwing J.H. down

14   to the asphalt "face-first" "without any type of holding on to her or

15   preventing it," which was "contrary to every aspect of the training"

16   on "controlled force," (id. at 130:19-132:2); and using pepper spray

17   against J.H. without active resistance or a credible threat (much

18   less both, as required), when J.H. had no weapon and was holding only

19   her prescription glasses and a surgical mask (id. at 140:21-142:8).

## III. RULE 29 STANDARD

21     Federal Rule of Criminal Procedure 29 permits a court to set

22   aside a jury's guilty verdict and enter a judgment of acquittal "of

23   any offense for which the evidence is insufficient to sustain a

24   conviction."  Fed. R. Crim. P. 29(a), (c).  However, because "a

25   jury's verdict is not to be disturbed lightly," United States v.

26   Begay, 673 F.3d 1038, 1043 (9th Cir. 2011), courts employ a "highly

27   deferential" standard of review in assessing sufficiency claims,

28   United States v. Rubio-Villareal, 967 F.2d 294, 296 (9th Cir. 1992)

(en banc).  The sufficiency analysis proceeds in two parts.

First, "a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  In so doing, the court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." Id. (citing Jackson, 443 U.S. at 318-19).  "[T]he government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 326).  Thus, when "'faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id. (quoting Jackson, 443 U.S. at 326, and citing McDaniel v. Brown, 130 S. Ct. 665, 673-74 (2010)).

Second, "the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Nevils, 598 F.3d at 1164 (quoting Jackson, 443 U.S. at 319 (emphasis in original)).  At this step, "a reviewing court may not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt," but rather "only whether any rational trier of fact could have made that finding." Id. (cleaned up) (emphases in original).  Only where "mere

1  speculation, rather than reasonable inference, supports the

2  government's case, or where there is a total failure of proof of a

3  requisite element," have courts found evidence legally insufficient.

4  Nevils, 598 F.3d at 1167 (cleaned up).

5  **IV.  ARGUMENT**

6      Defendant challenges the sufficiency of the evidence as to two

7  elements of his Section 242 conviction: (1) that he deprived J.H. of

8  her constitutional right to be free of unreasonable or excessive

9  force; and (2) that he acted willfully.[4]  (Mot. at 2.)  Defendant

10 ignores the applicable standard, disregards large swaths of evidence,

11 and misstates the facts.  His challenge fails as a matter of law.

12     **A.  The Evidence Was Sufficient for Any Rational Trier of Fact
           to Find That Defendant Used Unreasonable or Excessive Force**

13

14         1.  <u>The Government's Evidence Was More Than Sufficient</u>

15     The government's evidence showed all aspects of defendant's use

16 of force against J.H.  The numerous recordings of the incident,

17 standing alone, were more than sufficient to allow a rational trier

18 of fact to make the highly fact-specific finding that defendant's use

19 of force was unreasonable or excessive -- especially when considered

20 in the light most favorable to the prosecution.  The extensive

21 evidence of LASD's force policies and training, emphasizing the

22 primacy of force prevention, de-escalation, communication, and force

23 as a "last resort," only further supported the jury's verdict.  So

24 _____

25     [4] Defendant does not challenge the other two elements -- namely,
   defendant acted under color of law and victim J.H. was in California
26 -- both of which were conclusively proven by stipulation.  (GEX 127;
   CR 59 at 178:11-24.)  Nor does he challenge the jury's finding as to
27 the felony offense involving bodily injury and/or a dangerous weapon,
   both of which were proven beyond a reasonable doubt as shown by the
28 ample evidence of J.H.'s bodily injuries and extreme physical pain
   from the pepper spray described in Section II.C, <u>supra</u>.

too did Mr. Clark's expert testimony about the many ways defendant's use of force was inconsistent with those policies and training.

In assessing all this evidence, the jury was properly instructed that, in considering the objective reasonableness of defendant's use of force, it could consider, among other things, "[1] the severity of the crime, if any; [2] the extent, if any, to which J.H. posed a threat to the safety of the defendant or to any other person; [3] the extent, if any, to which J.H. was physically resisting arrest or attempting to flee at the time force was used; [4] the extent of the injury suffered, if any, by J.H.; and [5] the effort made, if any, by the defendant to temper or limit the amount of force." (CR 53 (Jury Instructions) at 10.) See also Graham v. Connor, 490 U.S. 386, 396 (1989). The jury was further properly instructed that "[t]he amount of force the officer may use is the amount that is reasonable to deal with the resistance or attack that he faces." (CR 53 at 11.)

As described in detail in Section II, supra, each factor, when viewed in the light most favorable to the government, strongly supported the jury's finding of unreasonable and excessive force: (1) there was no crime in progress when defendant arrived mid-day at the WinCo parking lot, and the circumstances were largely indicative of at most a possible retail Estes robbery in any event; (2) J.H. posed no safety threat to anyone as she merely filmed D.B.'s detention with her cellphone from a distance; (3) when defendant first approached J.H. without providing any commands or assessing the situation, J.H. was neither resisting arrest nor attempting to flee; (4) J.H. suffered bodily injury and extreme physical pain as a result of both defendant's unnecessary and excessive takedown and his unnecessary use of pepper spray; and (5) defendant made no effort to

avoid or temper the amount of force he used, as he was trained, and in fact he escalated his force throughout the encounter without any need to do so.  A rational trier of fact could have found defendant's use of force was unreasonable or excessive under these circumstances.

## 2.    Defendant's Arguments Fail

Tellingly, defendant's Motion focuses primarily on seeking to justify (albeit through omission and distortion) his decision to go "hands-on" J.H. in the first instance and makes scant reference to any evidence -- much less dispositive evidence to overcome the highly deferential standard -- supporting the reasonableness of his violent takedown and unnecessary use of pepper spray.  (Mot. at 3-6.) Defendant made these same arguments to the jury, but it rejected them.  Indeed, the unjustified violent takedown and use of pepper spray were the cornerstones of the government's evidence proving defendant's unreasonable and excessive use of force against J.H.  A rational jury resolving all possible evidentiary conflicts in favor of the government could (and did) find both those uses of force were indefensible.[5]  Nevils, 598 F.3d at 1164.

The most defendant can offer on the purported reasonableness of his body slam of J.H. was that, "as trained, [he] performed a takedown to overcome J.H.'s resistance."  (Mot. at 4.)  But in the preceding sentences, he misrepresents numerous facts and improperly

---

[5] In any event, at a minimum, the jury needed to find only one aspect of defendant's use of force was unreasonable or excessive, not the entirety of the encounter.  Accord Hyde v. Cty. of Willcox, 23 F.4th 863, 873 (9th Cir. 2022) ("Our cases also make it clear that the officers must reassess use of force in an evolving situation as the circumstances change.")  Defendant was trained to "reassess circumstances during an application of force," and this case was no exception.  (CR 59 at 19:18-20.)  Nonetheless, defendant's use of force was unreasonable and excessive at all stages of his encounter with J.H.

attempts to manufacture supposed "resistance" by J.H. where none exists.  For example, defendant falsely claims that "J.H. swung her arm and hit Deputy Kirk" before he "grabbed J.H.'s arm to ensure she would not attempt to hit him again."  (Id.)  In fact, as the jury saw countless times, defendant grabbed J.H.'s right arm first, after approaching her with no commands, causing J.H. to swipe her arm down reflexively.  (GEX 5, 36, 45.)  And the videos plainly show that this reflexive swipe did not actually make contact with or "hit Deputy Kirk," but rather swiped down through the air.  (Id.)

Defendant also claims that J.H. "continued to actively resist" before the takedown (Mot. at 4), when multiple angles from his body worn camera, WinCo surveillance, and the bystander video reflect just the opposite:  J.H. backpedaled as defendant grabbed her and tried to take her phone, and while pinned against a patrol vehicle and posing no threat, defendant wrapped his arm around her neck and slammed her face-first to the ground, all within three seconds.  (GEX 5, 36, 52, 75.)  A rational trier of fact could see this for what it was, to wit, defendant unreasonably grabbing J.H. in the first place without any commands or explanation, causing J.H. to retreat in fear, and then violently throwing her to the ground.   In any event, defendant's attempt to rewrite the factual record to suit his narrative, which the jury already heard and rejected, fails as a matter of law on sufficiency review.  See Nevils, 598 F.3d at 1164; United States v. Del Toro-Barboza, 673 F.3d 1136, 1145 (9th Cir. 2012) ("[T]he mere fact that evidence submitted by the government is wholly susceptible to innocent explanations . . . is not enough to reverse a conviction on appeal.") (cleaned up).

As for defendant's purported justification for twice pepper

14

spraying J.H., he argues only that he "resorted to a lesser form of force, per his training, O.C. spray," using it "to overcome [J.H.'s] resistance." (Mot. at 4.) Defendant again distorts the record, which the Court is required to view in the light most favorable to the government, not most favorable to defendant. When defendant used his pepper spray, J.H. was subdued on the ground, had not moved for several seconds, her hands contained only her prescription sunglasses and a mask, and defendant had a hold of one of her arms.[6] (GEX 5, 46, 52.) There was no resistance to overcome, nor did J.H. pose any threat whatsoever, both of which were required for defendant to use his pepper spray. (CR 59 at 35:5-7, 36:10-19, 70:14-19; GEX 105 at 4.) In fact, defendant does not posit any conceivable threat posed by J.H. on the ground to justify use of pepper spray, which alone sinks his argument.[7] But again, defendant's argument is irrelevant at this stage, especially where the jurors had every opportunity to review the same recordings defendant now distorts and the Court must presume the jurors resolved any conflicts in favor of the prosecution. Nevils, 598 F.3d at 1164; see also United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) ("[I]t is the exclusive function of the jury to . . . resolve evidentiary conflicts[] and draw reasonable inferences from proven facts.").

Defendant's central argument that he was entitled immediately to detain J.H. through force fares no better. (Mot. 3-6.) He ignores

---

[6] Defendant also had just threatened to punch J.H. in the face, told J.H. to "turn around" when his knee was on her neck, making it impossible for her to do so, and called in a "fight" when there was none. (GEX 5, 46, 52.)

[7] Defendant wisely does not reprise his expert's incredible testimony that J.H.'s prescription sunglasses justified the use of force because they could be a weapon. (CR 59 at 238:23-239:1.)

15

the substantial evidence of LASD policies and training that said

otherwise, and misleadingly cherry-picks testimony without proper

context and, fatally, in the light most favorable <u>to the defense</u>.

        First, defendant wrongly claims it was "undisputed" that he was

"under no policy obligation to 'de-escalate,'" and, "as he had been

trained, [he] attempted to secure J.H.'s hands as part of her legal

detention." (Mot. at 1, 3.)  To the contrary, the LASD Force Policy,

which defendant was trained on and required to follow (CR 59 at 9:24-

10:5), made clear that deputies "<u>shall</u> only use that level of force

which is objectively reasonable, and force should be used as a <u>last</u>

<u>resort</u>." (GEX 145 at 3 (emphases added).)  The Force Policy further

provided, "[w]henever feasible, [deputies] should endeavor to de-

escalate confrontations through tactical communication, crisis

intervention, advisements, warnings, verbal persuasion, and other

common sense methods." (<u>Id.</u>)  A rational juror could have found that

not only was defendant required to use force as a last (and not

first) resort, but also he was similarly required to employ de-

escalation techniques and tactical communications under the non-

exigent circumstances under which he found J.H -- after any possible

"crime in progress" had ended and she posed no threat of danger or

flight while filming defendant on her phone.

        Both LASD training witnesses confirmed that deputies were

trained to de-escalate and seek to obtain voluntary compliance, when

feasible as such was the case here. (<u>See, e.g.</u>, CR 59 at 13:13-16

(Sgt. Opina: "When feasible, deputies are trained to use alternates

other than force to try to decrease the intensity of a situation or

try to gain voluntary compliance with the suspect."); CR 58 at

100:14-18 (Deputy Diaz: "Our policy states that we -- if feasible, we

1  can -- to try to avoid using force whenever possible.  So, yeah, we

2  always want to start, again, without having to use force.").)  Indeed,

3  the evidence showed that deputies are required to take an eight-hour

4  Strategic Communications course focused on gaining voluntary

5  compliance through de-escalation and communication, consistent with

6  LASD policy to avoid force whenever feasible.  (CR 58 at 97:20-98:25.)

7      Defendant misleadingly cites testimony of Mr. Clark, about when

8  "force can be used" after a suspect "refuse[es] to consent to the

9  detention," in an effort to justify his immediate resort to force

10  without any attempt at communication or de-escalation.  (Mot. at 5.)

11  But defendant's selective and out-of-context quote ignores the entire

12  thrust of Mr. Clark's testimony -- consistent with that of the LASD

13  trainers -- that the consent should be sought through "tactical

14  communications" when feasible to "gain compliance through officer

15  presence and verbal skills and go no further."  (CR 59 at 121:15-18.)

16  The facts viewed in the light most favorable to the government

17  established that such communication was feasible.  If anything, it

18  was "undisputed" that defendant was required to de-escalate under the

19  circumstances, as any rational juror could rightly have found

20  defendant failed to do, especially when comparing his conduct to the

21  deputies' exact opposite approach to D.B. moments earlier.

22      Second and relatedly, defendant repeatedly claims that he had

23  the "right" and "obligation" to detain J.H. through force right away,

24  without assessing the surrounding circumstances.  (Mot. at 1, 2, 3-4,

25  5.)  Defendant is wrong.  The LASD Force Policy specified that

26  deputies "shall evaluate each situation requiring the use of force in

27  light of the known circumstances, including, but not limited to:  the

28  severity of the crime at issue, whether the suspect poses an

17

1  immediate threat to the safety of the member or others, and whether

2  the suspect is actively resisting, in determining the necessity for

3  force and appropriate level of force."[8]  (GEX 145 at 3-4 (emphasis

4  added).)  Sergeant Opina confirmed that "shall" meant that this

5  assessment was "mandatory," and deputies were trained to follow it.

6  (CR 59 at 20:21-21:2.)  Defendant was required to conduct this

7  assessment because it "helps determine which way an investigation can

8  go and how to make appropriate contact with the individual."  (CR 59

9  at 21:24-25.)  His failure to do so before putting hands on J.H. --

10  and his doubling down on his supposed right to eschew any such

11  assessment in his motion -- only further undermine any possible

12  reasonableness of the force he used from the start.

13      Moreover, both Sergeant Opina and Deputy Diaz testified about

14  deputy training on the importance of "giving yourself time and

15  distance, if you can" and "not rushing into a situation if it doesn't

16  call for it" to avoid using force when unnecessary.  (CR 58 at

17  114:15-17 (Dep. Diaz); see also CR 59 at 24:20-25 (Sgt. Opina: use

18  the "luxury of time, distance, and cover" when feasible "to gather

19  resources to help safely resolve" a situation); GEX 105, 109 ("Time +

20  Distance = Options").)  Defendant did the exact opposite here,

21  inconsistent with LASD policy and his training, by rushing J.H. and

22  immediately using force.  That was unreasonable and excessive, as any

23  rational trier of fact could have found under the circumstances.

24      Finally, defendant incorrectly reduces the government's argument

25  regarding the unreasonableness of his force to whether his conduct

26

27
_____

28      [8] Notably, these factors mirrored several of those in the jury
instructions (from Graham v. Connor), and all weighed heavily against
the reasonableness of defendant's use of force against J.H. here.

was "in retaliation to [J.H.] filming" him.  (Mot. at 1, 5-6.)  To be
sure, defendant did retaliate against J.H., which was relevant not
only to his willfulness (discussed below), but also to the LASD
policy prohibiting retaliatory force.  (GEX 145 at 4; CR 59 at 25:6-
26:21.)  But the evidence proved, and any rational juror could find,
that defendant's use of force against J.H. -- from start to finish --
was unreasonable and excessive regardless of defendant's motives or
retaliation.  Nonetheless, in seeking to confuse the issues further,
defendant makes the erroneous claim that the LASD "policy on
retaliatory force used on someone videotaping deputies only concerns
innocent bystanders," citing to Sergeant Opina's testimony on cross-
examination.  (Mot. at 6.)  Defendant fails to mention, however, that
Sergeant Opina clarified on redirect that the retaliatory force
policy, which could encompass retaliation for anything, "applies to
the application of force, whomever that application is directed
towards," including potential suspects.  (CR 59 at 77:1-15.)

    In sum, the "highly deferential" sufficiency standard, Rubio-
Villareal, 967 F.2d at 296, is especially appropriate here, where the
jury instructions made clear the "reasonableness of a particular use
of force is an objective standard that turns on the facts of each
case." (CR 53 at 10 (emphasis added).)  Taking all inferences and
resolving all conflicts in the government's favor, Nevils, 598 F.3d
at 1164, the evidence was more than sufficient to support the jury's
finding that defendant's use of force was unreasonable or excessive.

**B.    The Evidence Was Sufficient for Any Rational Trier of Fact
       to Find That Defendant Acted Willfully**

    1.    The Government's Evidence Was More Than Sufficient

    The government similarly proved in multiple ways that defendant

19

acted willfully, that is, as the jury was instructed, with "the specific intent to use more force than is necessary under the circumstances." (CR 53 at 11.) Viewed in the light most favorable to the government, the evidence was more than sufficient to support a rational trier of fact's finding of willfulness.

First, throughout trial, the jury saw and heard the starkly different ways in which defendant and Alejandre calmly dealt with D.B. as compared to defendant's aggressive and violent approach to J.H. (GEX 1, 5, 47.) The former was consistent with LASD's policies and training regarding use of tactical communications and de-escalation; the latter was the polar opposite. Defendant worked hand-in-hand with Alejandre in effectively communicating with D.B. before making physical contact and lowering the intensity of D.B.'s detention, reflecting defendant's knowledge of these critical de-escalatory tactics. Defendant's restrained approach with D.B. also was indicative of his understanding that there were no exigencies at the scene requiring immediate force or escalation. Thus, the jury could reasonably infer that defendant understood that his approach with D.B. was the appropriate exercise of his duties, and he acted willfully in knowingly using more force than necessary against J.H. just moments later.

Second, immediately after the use-of-force incident, defendant admitted to J.H. that he was "mad because you're not listening." (GEX 1.) With the benefit of viewing the incident from multiple camera angles, the jury was well-positioned to conclude that defendant was "mad" throughout his entire encounter with J.H., from the moment he saw her filming and heard her confront him and then immediately grabbed at her camera with both his hands. (GEX 1, 5,

52, 55, 69.)  A rational jury thus could find that defendant
impermissibly acted in retaliation against J.H. and specifically
intended to violate her rights; indeed, at this stage, the Court must
presume that the jury made such an inference.

Third, and just as likely, a rational jury could have found
defendant's anger clouded his judgment and he acted with a "reckless
disregard" for J.H.'s rights, which the jury was instructed was
"evidence of a specific intent to deprive that person of those
rights." (CR 53 at 11.)  To that point, both LASD trainers testified
about the importance of not acting out of "emotion" and "anger" or
"[a]nything that would cloud a law enforcement officer's mind in the
sense of how they're going to react to the situation." (CR 58 at
114:22-23; CR 59 at 25:14-26:21.)  The Strategic Communications
training outline similarly reflected training on the need to "[s]tay
in control of your emotions and keep your ego in check." (GEX 109 at
2.)  Defendant received that training just four months before his use
of force against J.H. (GEX 109A.)  A rational jury could have found
defendant acted willfully on this basis as well.

Fourth, the evidence proved that defendant learned just over
three weeks before the WinCo incident that his LASD station was
recommended to receive a station-wide de-escalation briefing as a
result of another use-of-force incident in which he was involved one
year earlier. (GEX 126.)  A rational jury could reasonably have
inferred the need to de-escalate was fresh in defendant's mind three
weeks later when he did just the opposite in dealing with J.H.

Fifth, as described throughout this brief, defendant received a
plethora of use-of-force, force prevention, de-escalation, and
strategic communications training during his career at LASD, hundreds

21

of hours in the aggregate.  (CR 59 at 5:17-7:6, 32:3-16; GEX 101, 102, 103.)  He also acknowledged reviewing and understanding LASD's use-of-force policies, which emphasized these topics as well.  (GEX 100; CR 59 at 9:17-10:5.)  A rational jury could find that, based on his all-encompassing training, defendant understood his obligation to seek voluntary compliance and use force as a "last resort" under the circumstances in which he encountered J.H., but he specifically intended to use more force than was necessary against J.H., or at a minimum acted in reckless disregard of her rights.

Finally, even though he was under no obligation to do so, defendant called his own expert to testify about how his actions were supposedly consistent with policy and training.  However, defendant's expert -- an officer with the Anaheim Police Department with little familiarity of LASD policy and training and who made incredible claims about cellphones and prescription glasses being potential weapons (CR 59 at 219:1-220:2, 228:23-25, 238:23-239:1) -- had no answer when confronted with statements from Alejandre laying bare that defendant's actions were inconsistent with LASD force training.  Specifically, during cross-examination of defendant's expert, the jury heard an audio clip from an interview with Alejandre, in which Alejandre said, in assessing defendant's approach to J.H., that, "if it was me, I would be like, 'come here,' 'give me your hands,' 'show me your hands,' or 'you're going to be detained,' 'I need you to come here,' stuff like that."  (GEX 1125; CR 59 at 221:1-19.)  Alejandre confirmed that these commands and advisements were "typical protocol for training purposes."  (Id.)  Defendant's expert could not dispel the clear implication from Alejandre's interview that defendant's approach to J.H. was in fact contrary to his LASD training.  In any

1  event, whether the jury actually had any doubts about defendant's

2  knowledge of LASD trainings, policies, and briefings is beside the

3  point on sufficiency review.  All inferences are drawn in the

4  government's favor and it is presumed the jury concluded defendant

5  was well aware of his obligation to avoid using force against J.H. if

6  feasible, which it was.  See Nevils, 598 F.3d at 1164.

7              2.   Defendant's Arguments Fail

8       Despite this record, defendant claims the government's theory on

9  willfulness was "hitched almost entirely to the proposition that

10 Deputy Kirk's physical contact with J.H. was motivated by his anger

11 towards her and his desire to retaliate because she was filming and

12 'did not listen.'"  (Mot. at 6.)  Defendant is correct that this

13 evidence helped prove that he acted willfully.  Indeed, it is

14 dispositive of this element at this stage when viewed in the light

15 most favorable to the government.  But the evidence of defendant's

16 willfulness went far beyond retaliation, as detailed above.

17      Defendant also largely sidesteps any possible justification for

18 his violent takedown and use of pepper spray when J.H. was not

19 resisting or a credible threat to him.  The jury rightfully concluded

20 based on defendant's training on POST and LASD policies that he knew

21 he had no justification for the excessive and violent force he used

22 against J.H. and thus acted willfully in applying it.

23      Without any credible basis for his violent conduct or meaningful

24 response to the evidence of his retaliation and anger -- which the

25 jurors saw and heard with their own eyes and ears -- defendant falls

26 back on distorting the record regarding the policies and training he

27 received at LASD, which informed his state of mind.  (Mot. at 7-9.)

28 He makes the astonishing claims that he "was acting as he had been

trained" and the "government's witnesses testified <u>unequivocally</u> that pre-detention commands were not required per policy." (Mot. at 7 (emphasis added).) He disregards the overwhelming weight of the testimony from Sergeant Opina and Deputy Diaz (not to mention the LASD Force Policy) about the paramount importance of de-escalation and force as a last resort when feasible. Defendant's distortion of the record is built on a series of selective quotes and mischaracterizations of the LASD training witnesses' testimony.

For example, defendant quotes Deputy Diaz's testimony that deputies have to "make [a] judgment call on their own to say, if they chose to use force, then [they] have to explain why." (Mot. at 7.) But he omits Deputy Diaz's clarification two answers later that LASD trainers "go by our policy" in training deputies, and "[o]ur policy states that . . . if feasible . . . to try to avoid using force whenever possible." (CR 58 at 100:14-17.) Defendant also quotes Deputy Diaz's testimony that he "would want to detain" someone, if he had "information that [they] may have been involved in a crime," to ask about their potential involvement. (Mot. at 7.) But he omits that one question later, Deputy Diaz clarified that, "if feasible . . . [he would] ask them questions before going hands-on" and he instructs deputies on that approach. (CR 58 at 102:2-6.)

Defendant similarly takes Sergeant Opina's testimony out of context. For example, defendant quotes Sergeant Opina that deputies "do not have a duty to retreat." (Mot. at 8.) He ignores, however, Sergeant Opina's answers directly before and after: that deputies are "trained to use verbal communication when possible . . . to try to prevent the use of force when reasonably possible," (CR 59 at 14:13-16), and that "when reasonably possible" includes "when they

have time to use verbal communication before using force" and "when they have distance to use verbal communication before using force." (Id. at 14:22-15:2.)  Defendant also cites Sergeant Opina's testimony that "deputies are trained that, when a suspect is resisting, they are allowed to use objectively reasonable force."  (Mot. at 8.)  But yet again, he fails to mention Sergeant Opina's clarification that when a suspect is "not actively resisting before a deputy makes contact" (as was the case with J.H. here), "there are other options available," including "[d]e-escalation, verbal communication, verbal commands" that are all intended to "decrease the intensity of the situation."  (CR 59 at 23:25-24:8.)

Defendant's claims about the insufficiency of the government's evidence of willfulness are thus premised on cherry-picked quotes and misleadingly framed arguments, against the great weight of the evidence.  But most fatally, his claims also are cast in a light most favorable to him instead of to the government, in direct contravention of the sufficiency standard of review.  Nevils, 598 F.3d at 1164 (court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").  Accordingly, defendant's challenge to the sufficiency of evidence of willfulness also fails as a matter of law.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny defendant's Motion for Judgment of Acquittal.